al. Good afternoon. My name is Richard Gahl. I represent S.E. Property Holdings, L.L.C. as successor by merger to Vision Bank. May it please the court, counsel. The Fifth Circuit in Direct TV v. Budden held that while a summary judgment affidavit can say it is based on personal knowledge, there is no requirement for a set of magic words like based on personal knowledge. Rather, personal knowledge may be reasonably inferred based on the affiant's position in the company, the nature of the facts sworn, and as I said, given their position. In Brazos River, the Fifth Circuit, looking to 30B-6 as an analogy, recognized that discovery, of course, from corporations and entities comes from natural persons who can speak for a corporation, such as a vice president, as we have here. That's why 30B-6 allows an entity officer to speak or on information available to the entity and does not mandate knowledge. Now, why would that be? This is the simple rationale. In this day and age, perhaps in all days and ages, companies, employees come and go, officers come and go over a period of time. Corporations speak through natural persons and they come and go. Obviously, that's what the Fifth Circuit has held as well. If you look at cutting underwater, the Fifth Circuit reiterated that personal knowledge may be inferred from the facts stated by an officer, citing an official title alone can be enough to indicate a basis of knowledge. And personal knowledge does not require contemporaneous knowledge, and that's, of course, true in an entity or a corporate setting. And that rule and policy in the Fifth Circuit makes common sense. If a corporate representative had to have contemporaneous knowledge, I dare say most corporations would be out of luck, given the mobility of officers and employees. That would not make sense. Here, the bankruptcy court below, where we argued partial summary judgment, part of the case actually went on to trial, which I'll talk about in a minute, but here we're talking about what was excluded on partial summary judgment. The bankruptcy court did not follow that Fifth Circuit precedent and ultimately rejected an affidavit by S.C. Property Holdings' vice president. I may refer to it, that is, S.C.P.H., to save time. Here, in response to the motion for partial summary judgment, like I said, the bankruptcy court rejected that affidavit because the magic words, personal knowledge, were not there. While the Fifth Circuit says that's not necessary and can be inferred from the position. The affidavit that we supplied in response on summary judgment for S.C. Property Holdings, Successive Division Bank, was a sworn affidavit. Ms. Jennifer Corbett indicated in her affidavit that she signed before a notary, sworn under oath, that she was the vice president of S.C.P.H., that she had reviewed the affidavits by the movements, that she had based it on loan documents, security agreements, and other documents, after review of collection efforts by S.C. Property Holdings, and significantly after reciting, this is so important, that S.C. Property Holdings, with respect to accounts receivable collections at issue, these were Livingston Parish accounts receivable collections, that the bank, S.C. Property Holdings, had as collateral. Significantly, the bank had paid $3 million in attorney's fees in an effort to help go and collect those accounts receivable related to Livingston Parish. Why? Because it was their collateral. Now, the ARs later were learned to— Is it necessary for the corporate affiant, Ms. Corbett, is it necessary for the corporate affiant to have been employed in that position when the disputed action was allegedly happening? No, not according to cutting underwater, because why? The court said that contemporaneous knowledge is not necessary to have personal knowledge. We know that corporate entities constantly have officers and employees go back and review records, look at records, so that they can speak for the company. Why? Because companies are abstract creations by human beings, and they can only speak through people. And so if people leave, then under 30b-6, under cutting underwater, they can still speak for that company. Otherwise, think about, if that were the— And it's not the law in the Fifth Circuit, by the way. If that were the policy, that would be hugely problematic. She further swore in her affidavit that the collateral, those ARs, those collections from Livingston Parish— By the way, these collections were related to some collections received after a hurricane. The entity at issue here was a disaster recovery company, and the debtor in the bankruptcy case, our position is, affected the transfer of those collections, ultimately outside of the entity where they would have been S.C. Property Holdings collateral. What Ms. Corbett said in her affidavit on behalf of the entity was several things. One, they were our collateral based on the loan documents, that those collections were to be significantly held in trust under the loan documents. That's what the loan documents say that were attached to her affidavit. That very significantly, she said, S.C. Property Holdings, as a vice president, stated, S.C. Property Holdings did not consent to the use of that collateral. Now, she also indicated there was a 2012 letter, which may be mentioned by the other side that I want to bring up. There was a letter sent by S.C. Property Holdings in 2012 where it was stated that S.C. Property Holdings did not consent to their use of the collateral. But this is very, very, very important. That 2012 letter was reminding the Greens that there was not consent in response to the Greens' request to use that collateral. Think about that. If they're right that they already had consent to use the collections, why did the Greens ask for permission? So you see, the 2012 letter was not like some first statement that you couldn't use it. The loan documents said that. This was in response to their request to use them, you see. Why would they be asking if they truly could already use them? And importantly, they indicate in their response, which we took great issue with, that the 2012 letter indicated that they said, which is not correct, that the letter said there was no further consent to use. That letter does not say that. My able colleague indicated that in the response. But that is not what the letter said. Nowhere does it say anything about further consent. It says we do not consent in response to your request. It goes on to say we will not make further advances under the loan. That's wholly different from what they're saying. That may have been a mistake on the other side, but I just think it's important to point that out. Now, again, why in the world would S.C. Property Holdings have paid $3 million in attorney's fees to go and get those Livingston Parish collections, which was their collateral, unless they intended to get them, unless they intended not to have them used in some other way? Banks typically don't do that. They paid attorney's fees in order to go get collections because they want to apply them ultimately against a balance, you see. So it would make little sense for them to have paid those fees unless they intended to get them. Now, let me give a little bit of backdrop here quickly. This ultimately arose from an adversary proceeding in a bankruptcy case under 11 U.S.C. 523, which does two things. One, does several things, but in this case, 523A2A is actual fraud, which a lender or some other entity can bring if there was fraud by a debtor. Also, we allege 523A6, which is when there is willful injury to the, in this case, the bank's collateral or to the bank itself. You're allowed to bring those actions when what happens? Bankruptcy law is like this, and I regularly practice in bankruptcy and so does my able colleague. This is the law. Bankruptcy is for the honest but unfortunate debtor. If they've engaged in fraud, if they've engaged in conduct that would result in willful injury or injury, then they don't get a discharge as to that particular creditor. And that's what the case was about below, in which the court entered partial summary judgment. And willfulness can be shown a couple of different ways. By objective certainty of harm, i.e., you read your loan documents you signed. You know if you do something with that collateral, it's going to cause harm or subjective. In this case, we even have subjective intent shown. At one of the depositions, Mr. Green, who we are saying affected the transfer, was asked whether he had any enmity towards our client, S.E. Property Holdings. And he said, you bet your blank I have enmity towards S.E. Property Holdings. Now, that may be true that he has that, and he said that, and it appears to be true. And if that's the case, then sufficient willfulness is shown. Now, as I said, some of the issues actually went to trial. The judge ultimately had a trial on many fewer issues because he had not allowed these issues to go to trial that we're talking about on partial summary judgment and ultimately found non-dischargeability under 523 related to some funds that were transferred to pay Mr. Green's accountant. But it was a very small judgment because the collections issue was thrown out on partial summary judgment based on this affidavit issue. Now, the bankruptcy judge, it's our position, should not have rejected the affidavit because no magic words are required and knowledge can be inferred, as I said before. The bankruptcy judge, let me say this, also made comments about the affidavit. There was a comment that it was artfully worded. Now, all I have to say about that is that sounds like weighing credibility. And the shortstop case from the Fifth Circuit that we cited says you can't weigh credibility. You can't weigh it at the summary judgment stage. Of course, you can't weigh evidence at all. And finally, let me just say quickly, with respect to affidavits filed by the other side, first of all, we don't believe they show any evidence that we consented to the use of this collateral. But insofar as there is a dispute, that's for a trial, not to be weighed at summary judgment. Now, there's another issue I need to talk about quickly. The judge also rejected the affidavit because the judge indicated that S.E. Property Holdings was a new company. Judge Willett, this kind of goes to the point you were making. But this is important. In Engle, Judge Jolly said that the new entity in a merger succeeds to the rights and liabilities and responsibilities of the old company. And we all know this. The new company subsumes into the old company. The good, the bad, the ugly goes from old co. into new co. Lock, stock, and barrel. So when S.E. Property Holdings merged, Vision Bank merged into S.E. Property Holdings, all of that information, all of that knowledge went with it, right, which is different from an asset purchase. That's a completely different situation. That, you know, I hate to use a golf term, is kind of a chip shot. I mean, the judge got that just plain wrong. Frankly, the other side doesn't really address it, I don't think, in any real way. And so on that ground alone, the bankruptcy judge's partial summary judgment could be reversed. I see that I only have a couple minutes. One final point I want to talk about. There's a charging order at issue here. This is another issue. Setting aside the affidavit for a second, the judge granted partial summary judgment with respect to a charging order. A charging order is where, in this case, a United States district judge charges the interest of, you know, in this case, Mr. Green below. There were $225,000 at issue based on this charging order. The charging order covered a company called Green & Sons, LLC, which was a real estate holding company in South Alabama. That entity, a real estate holding company, soon after the charging order was entered, had $225,000 in earnings that went to Mr. Green's childhood friend in Panama. I'm not talking about Panama City. I'm talking about Panama, down in Panama Canal, Panama, went overseas based on what was stated to be a loan. Now, that charging order was issued related to a $26 million judgment that the late Judge James Brady in the Middle District of Louisiana had provided to my client. And so we go to charge that interest. Now, the bankruptcy judge here, you know, said that that order, that charging order, wasn't broad enough to cover those sorts of payments because the words constructive dividends wasn't used. But the judge did use the word distributable, and it was based on very broad state law. The federal judge, seasoned federal judge, entered a perfectly broad charging order in this case. The bankruptcy judge took issue with it and granted summary judgment on it. But it was plenty broad because distributable includes a suffix, A-B-L-E, able to be distributed, could be distributed. And for that reason, also, the bankruptcy judge got it wrong. I see that my time is up. I've reserved five minutes. If it pleases the Court, I'll take my seat. Thank you, sir. Mr. Crawford? Good afternoon, Your Honors. Michael Crawford, law firm Taylor, Porter, Brooks, and Phillips in Baton Rouge for the Appley Lawrence Green. I certainly hope that I take far less than 20 minutes this afternoon, but I do want to address first some of the things that my opponent brought up in his time before you. Judge Dodd of the Bankruptcy Court in Baton Rouge looked at this affidavit precisely the way he should have. Mr. Gall is probably correct that companies can rely on officers. They come and go, and sometimes you can reasonably infer knowledge. But what Judge Dodd did and what I submit that would be appropriate for you to do today is to actually look at the affidavit that S.C. Property Holdings presented in an effort to defeat our well-supported summary judgment. There's two affidavits in this case, right? Well, there's, Your Honor, actually there's four. Mr. Green submitted an affidavit. I'm sorry, yes. There was one affidavit by S.C. Property Holdings, and that affidavit was by Jennifer Corbett, who purported to be a vice president of the bank. Before I forget to say this, I want to say that this whole issue of ancestor and title, successor, merger, which entity, was it Vision Bank? Was it S.C. Property Holdings? We are not taking issue with that. Judge Dodd didn't either. That is a red herring. I'm going to refer to it as the bank, okay? And when we talk about reasonable inferred knowledge with an affidavit, I think we can reasonably infer that Ms. Corbett knew absolutely nothing about anything involved in this case. And here's why. Her affidavit actually screams. Every time I read this affidavit, it screams out for where is the affidavit of Mr. Balmeister? So the theme of my talk today is where is Mr. Balmeister? Mr. Balmeister, as attested to in the affidavit of Mr. Green and also with respect to this 2012 letter, was actually the person at the bank that was dealing with this loan and with the request to continue servicing the loan. He's nowhere to be found. Ms. Corbett, on the other hand, is unable in her affidavit to attest that she had any knowledge, involvement of any kind with respect to this loan. Okay? That's number one. Number two, she can't even attest to being with the bank during the relevant time period, which pretty much runs somewhat into 2011, but primarily was 2010. Okay? I don't know whether she was with the bank or not, but her affidavit doesn't mention it. Seems kind of important to me. Where's Mr. Balmeister? Now, it goes on further. Mr. Gall may be right. I don't know. That may not be fatal. I don't know if it's fatal or not, but it's not helpful. Keep in mind the Summer Judgment Standard requires the non-moving party to come up with something to challenge what the moving party has said. In this case, the affidavit submitted by Mr. Green of the office manager for IED, Cheryl Ellison, we believe was the primary reason why Judge Dodd did what he did. Ms. Ellison attested to the course of conduct between IED and Vision Bank back in 2009, 2010, and 11. Mr. Gall is correct. This was a disaster recovery firm that was hired by Livingston Parish to do cleanup work after Hurricane Gustav, which I believe was September of 2008, if I'm not mistaken. That affidavit states very plainly, and it's not contradicted, that the bank required weekly reports on the use of receivables, sources and uses of cash, so that the borrowing base could be established for the line of credit. Ms. Ellison's affidavit also contains an itemized list of sources and uses of funds. It's worth noting that of the $7.2 million that IED collected from Livingston Parish, they paid the bank 40% of that. When this complaint was filed, the complaint was filed accusing the Greens essentially of taking the $7.2 million and using it for their personal use. Well, they abandoned that because that's not true, as ably evidenced by Ms. Ellison's affidavit. So in response to that course of conduct, it's very important to point out that during this time period when this money was coming in the door from Livingston Parish, before ultimately FEMA and Livingston Parish had a falling out, that's not before this court, but we were supposed to get about $25 million more and we didn't get it. So Mr. Gall started off his talk talking about the honest but unfortunate debtor. I submit to you that if there ever was an honest but unfortunate debtor, it's Lawrence Green. His company was owed $30 million by Livingston Parish, didn't get paid, and you can't collect against a municipality. So that's pretty unfortunate. He didn't run off to Tahiti with this money. That affidavit shows very clearly it was used to pay wages. Keep in mind, IED was still in business in 2008, 2009, 2010. Look at that affidavit, Your Honors, and you will see that Vision Bank was still allowing IED during this time period, the relevant time period, where Ms. Ellison apparently was nowhere to be found, was actually still drawing down on their line of credit availability. That's what Judge Dodd relied on. It was a course of conduct on a performing loan for a business that was in business. This $3 million spent later, I submit to you, was later, after the company went out of business. So paragraph six of Ms. Ellison's affidavit is, I submit to you, totally out of bounds. Again, where's Mr. Balmeister? Mr. Balmeister is nowhere to be found with respect to these weekly reports. Is it logical to conclude that a bank with a $20 million-plus loan was completely in the dark on collection efforts? We have an affidavit saying they were getting a report every week. It was being sent to Mr. Balmeister, not Ms. Corbett. Let's talk about the letter in 2012, and this was really the kicker for Judge Dodd. He wasn't weighing the credibility of witnesses. He primarily looked at Ms. Corbett's affidavit. He did say it was artfully worded. You know, that wasn't my phrase. That was Judge Dodd's. I used it some because I liked it. It was artfully worded. To make it sound like the consent to do business, you know, that was clearly cut off in 2012, applied two years earlier. And that's the primary thrust of why Judge Dodd disregarded the affidavit. He didn't go right out and say this. I did. You know, it was as if there was no affidavit at all. Ms. Ellison testified essentially she didn't know anything about anything other than in 2012 we weren't going to loan them any more money. Well, this money was collected in 2009 and 2010 while the company was still in business. So you can reasonably infer as Judge Dodd did, as Judge Dick did at the district court level, that Cheryl Ellison's, excuse me, that Jennifer Corbett's affidavit did nothing to rebut or warrant a trial of what was put forth by the Greens. Now, with respect briefly to the, so really getting back to the bankruptcy angle on this, if there was consent and knowledge, which their affidavit really can't talk to, if there was consent and knowledge of the bank, then how could it be willful and malicious for IED to pay their employees, to pay insurance, fuel, vendors, taxes? I mean, that's what they were doing with the money. That's what Cheryl Ellison's affidavit shows. They didn't go to Tahiti and buy a condo. With respect to the loan, Greene & Sons LLC is not a judgment debtor. That's a key distinction here. Mr. Greene owns 50% of this LLC, but Greene & Sons is not a judgment debtor. They were a company that was a real estate investment company. They had $225,000 in the bank. They made a loan for a real estate development project in Panama. Instead of making distributions to its members, as Judge Dodd correctly noted, holding a charging order does not embolden a creditor to force a distribution. It's just there to catch them if they come. And I argued this to Judge Dodd. That money could still be in the account. Five years later, it could still be sitting in that account, and there is not a single thing SE Property Holdings could have done. What is a charging order? I'm sorry, sir? What is a charging order? I'm not clear on what that is. Okay. A charging order is somewhat akin to garnishment, Your Honor. It's a collection device for a creditor where if you have a judgment against a member of an LLC, the charging order, and I've done them before, the charging order is entered by a court essentially saying any distributions, equity, dividends, not really a dividend with an LLC, but similar concept. Money that goes to the owners of the company are subject to this charging order. So if they had given $50,000 to Lawrence Green after, you know, from this bank account, it would have gone to SE Property Holdings. Exactly. It works that way. But it's not as good as a levy or seizure because it's a somewhat passive remedy, Your Honor. In other words, you have to wait for there to be a distribution to a member before it has any force and effect. You can't compel it, and Judge Dodd noted that in his decision. So they could have given that money to the church, it could have stayed in the bank account, or they could have made an investment in a company from Panama, which is what happened. The key right now is there is not a scintilla of evidence that was presented by SE Property Holdings that that loan was fraudulent or designed in some malicious way to harm SE Property Holdings. It was $225,000 on what now is about a $50 million judgment. No evidence. There was a lengthy discovery period, and they did no discovery at all other than depose Mr. Green with respect to that loan. Mr. Green testified, it's in his affidavit, that there have been loan payments made. Yes, it's not, you know, it's not current, but there have been payments made. And there was nothing, absolutely nothing presented by SE Property Holdings to defeat some re-judgment on that issue other than legal arguments saying it smells fishy, essentially. And that's not enough. You know, I don't know what the Supreme Court meant when it said it has to be more than a metaphysical doubt. As cited in my brief, Judge Dodd relied on it as well. I'm not sure what a metaphysical doubt is, but I don't think SE Property Holdings meant it because they didn't present anything to defeat some re-judgment. And for those reasons, unless your honors have additional questions, I submit to you that the decisions of both lower courts were correct and that some re-judgment, the grant of some re-judgment should be affirmed. The affidavit, I have it here. I have it quite marked up. As you can see, it's chocked full of facts. The other side, my friend indicated a moment ago that there was nothing in here regarding a dispute about the ability to use those receivables. Well, Ms. Corbett, vice president, sworn under oath, says SEPH did not consent to the request. She goes on to talk about the $3 million that SE Property Holdings paid to go out and collect those receivables so there would be something to apply against the judgment, this large judgment. Banks loan money on the promise they'll be repaid. And the bank document said that the receivables were to be held in trust. They don't even deny that. And her affidavit is perfectly fine, and you can reasonably infer from the facts that she states, given the fact that she's a vice president of an entity, that these are the facts. That's what the law is in the Fifth Circuit because it makes sense, and I'm not going to repeat that from earlier. This mysterious question about Mr. Balmeister who wrote the 2012 letter, let me say this. The 2012 letter was, again, a response to their request to be able to use the receivables. Why would they ask if they thought they had consent? Mr. Balmeister's not a mystery. That letter was written in 12. Ms. Corbett was the vice president in 2018. This is when the affidavit was submitted, which makes the point that in the Fifth Circuit it's a matter of policy. You don't want to say that corporations must have the person who was there way back when sign the affidavit. If they're not there, they've gone on to another part of the bank, or they're not part of that entity anymore, then you get a vice president who can look at the documents. Just like 30B-6. It makes perfect sense. When the judge did not take that affidavit into account, it created a reversible error. Now, another thing I heard my able colleague say was a lot of facts, a lot of facts about the other. Judge Dennis, you asked about their different affidavits. Well, our vice president wrote an affidavit that should have been taken into consideration under Fifth Circuit law. They submitted affidavits that my colleague indicates created a disputed fact. Okay. Well, we don't agree that it created a disputed fact, but even if he's right that it did create a disputed fact, when said against the vice president of S.C. Property Holdings' affidavit, we're outside of summary judgment territory. We're weighing evidence at that point, which is inappropriate on summary judgment. Obviously we know that. The charging order, my able colleague said exactly how a charging order works, but let me say this significantly. The indication was, I didn't say this earlier, but by the way, all of these facts are to be applied in a light most favorable to the non-movement who is my client. So, I mean, significantly, but this charging order indicates, and I'm just going to read it, and it includes the Green and Sons entity, it charges potential dividends and distributions of that entity, and it says, this judge said, you know, Judge Dodd said that this must have been written by a new judge. This was written by a judge who had been on the bench for 13 years. A federal district judge said, distributions are to be made with respect to any transferable interest, listing for us the amount and the time, and then also that the amounts that become due or that they are to account for and provide to S.C. Property Holdings, amounts that become due or distributeable. That suffix, A-B-L-E, is significant. That means if they were distributable. Now, yeah, they went to Panama and all that. That also sounds like a disputed fact. Why were we weighing that at summary judgment? Why was that thrown out at summary judgment? What should happen here? What should happen here is that the rest of the trial ought to take place. The judge found 523A2A fraud on part of the funds. Well, the rest of the trial ought to take place. All we're asking for here is that we've shown a proper affidavit, we've disputed those facts clearly, charging order is disputed, let us go back and just try the rest of the case. And if there's to be weight of credibility and weight of the evidence, then we're simply asking to have the case reversed and remanded back to have a trial, to have our day in court, to have a trial on the merits where the weight can then be given. We respectfully ask that. And my time is up, and I'm very grateful for the opportunity to have been here today. Thank you. Thank you, Judge. I conclude that this case will be submitted, and that ends our oral arguments. Thank you.